**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**October 8, 2013**

# In the Court of Appeals of Georgia

A13A0948. MINGLEDOLPH v. THE STATE.

BRANCH, Judge.

Dennis Mingledolph was tried by a Richmond County jury and convicted of voluntary manslaughter,[1] possession of a firearm during the commission of a crime,[2] and possession of a firearm by a convicted felon.[3] He now appeals from the denial of his motion for a new trial, asserting that the evidence was insufficient to sustain his conviction for voluntary manslaughter and that he received ineffective assistance of counsel. We find no error and affirm.

---

[1] OCGA § 16-5-2 (a).

[2] OCGA § 16-11-106.

[3] OCGA § 16-11-131.

On appeal from a criminal conviction, the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict. *Martinez v. State*, 306 Ga. App. 512, 514 (702 SE2d 747) (2010). So viewed, the record shows that Mingledolph's convictions arise out of the accidental shooting death of Johnny Walter Davis on June 30, 2008. Approximately one year before Davis was killed, Willie Coe stole $2,400 worth of marijuana from one of Mingledolph's associates, Donte Simmons. On the day of Davis's death, Mingledolph told Simmons he had just seen Coe in their neighborhood. Simmons's girlfriend then drove Mingledolph, Simmons, and a man known only as "Block" through the area in search of Coe. When they located Coe, Mingledolph handed Simmons a 9-millimeter pistol, and all three men exited the girlfriend's car and robbed Coe at gunpoint. During the robbery, Mingledolph encouraged Simmons to shoot Coe, but Simmons instead allowed Coe to leave.

Coe ran off in the direction of Lucky Street. When he arrived on that street, he got into the car of his close friend and associate, Lewis Harmon, who was parked on the curb. An agitated Coe reported to Harmon and Harmon's girlfriend that he had just been robbed and threatened by Mingledolph and Simmons.

2

After Coe left the scene of the robbery, Mingledolph, Simmons, and Block returned to the car in which they were riding and began to drive back to the apartment of Simmons's girlfriend. En route, the group drove down Lucky Street, where they saw and recognized Harmon's white Suburban. Knowing that Harmon was a friend of Coe's, Block indicated that the group should drive away from the area, to avoid any additional confrontations. Mingledolph, however, asked to be let out of the car; before Mingledolph left the vehicle, Simmons returned the 9-millimeter pistol to him. As Mingledolph exited the automobile, Simmons's girlfriend noticed that Mingledolph was holding his hand over his back pocket, in an apparent attempt to conceal his gun from view.

When Mingledolph got out of the car in which he was riding, Harmon stepped out of his own vehicle to greet Mingledolph. Fearing that there would be further trouble between Mingledolph and Coe, Harmon told Mingledolph that narcotics officers were nearby and indicated that Mingledolph might want to leave the area. During this time, it appeared that Mingledolph was attempting to see through the Suburban's windows to determine what passengers were in the vehicle. Because of the vehicle's tinted windows, however, its rear passengers were not readily visible. According to Harmon's girlfriend, as Mingledolph was attempting to look into the

3

Suburban's windows, Coe was in the back of the car attempting to conceal himself from view.

Mingledolph walked away from the Suburban and towards some empty houses across the street. Harmon then went into a nearby house to purchase marijuana. After a few minutes had passed, Coe armed himself with Harmon's 10-millimeter pistol and left the car to see why it was taking Harmon so long to complete his transaction. Shortly after Coe exited the Suburban, he and Mingledolph became engaged in a gun battle. According to Harmon's girlfriend, who was the only eyewitness to testify at trial, the battle began when Mingledolph saw Coe and fired at him; Coe then returned fire. During their exchange of gunfire, Mingledolph was positioned at the back of a pick up truck owned by Johnny Davis, which was parked on the curb. Coe was positioned at the front of the vehicle, and both men were using the truck to shield themselves as they fired bullets at one another. The gunfight ended when Mingledolph fled the scene.

Davis, who was in his truck at the time, was struck in the head by a bullet and killed. Although numerous shell casings and bullets from both weapons were recovered at the scene, no bullet was recovered from Davis's body. Thus, investigators

4

were unable to determine whether the bullet that killed Davis came from Mingledolph's or Coe's gun.

A grand jury indicted both Mingledolph and Coe on charges of malice murder, felony murder while in the commission of aggravated assault, and possession of a firearm during the commission of a felony; in separate counts, each man was also charged with possession of a firearm by a convicted felon. The two men were tried together. At trial, none of the four witnesses Mingledolph's lawyer had subpoenaed to testify on his behalf appeared. Thus, after his lawyer called those witnesses to the stand and then announced they were not present, the attorney rested without presenting any witnesses or other evidence on Mingledolph's behalf.

The jury found Coe guilty of malice murder and all remaining charges.[4] With respect to the malice murder charge, the jury found Mingledolph guilty of the lesser included offense of voluntary manslaughter; it also found him guilty of all remaining charges.[5]

---

[4] Coe is not a party to this appeal, and his conviction was recently affirmed by the Georgia Supreme Court. See *Coe v. State*, 293 Ga. 233 (___ SE2d ___) (2013).

[5] The trial court merged the felony murder count with the voluntary manslaughter count.

1. Mingledolph first contends that the evidence is insufficient to sustain his conviction for voluntary manslaughter.[6] In addressing this enumeration of error we ask whether, when viewed in the light most favorable to the jury's verdict, "the record contains some competent evidence to prove each element of the crime[ ] of which the defendant was convicted." (Citation and punctuation omitted.) *Lee v. State*, 320 Ga. App. 573, 576 (1) (740 SE2d 307) (2013). If the record does contain such evidence, then we must uphold the conviction. Id.

Mingledolph's challenge to the sufficiency of the evidence is based on Georgia's self-defense statute, OCGA § 16-3-21. That statute provides, in relevant part:

> [a] person is justified in threatening or using force against another when and to the extent that he . . . reasonably believes that such threat or force is necessary to defend himself . . . against such other's imminent use of unlawful force; however, . . . a person is justified in using force which is intended or likely to cause death or great bodily harm only if he . . . reasonably believes that such force is necessary to prevent death or great bodily injury to himself.

---

[6] "A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." OCGA § 16-5-2 (a).

6

OCGA § 16-3-21 (a).

In support of his self-defense argument, Mingledolph points out that although Harmon's girlfriend testified at trial that Mingledolph fired the first shot, this statement was contradicted by the statement the girlfriend gave to police shortly after the incident. In that statement, which was introduced at trial, the girlfriend told police that it looked as though Coe left the Suburban and then attempted to "sneak up on" Mingledolph; that Coe fired the first shot at Mingledolph; and that Mingledolph then returned fire. Additionally, in his statement to police following the incident, Harmon also reported that Coe left the Suburban and tried to "sneak up on" Mingledolph. Mingledolph contends that this evidence supports the conclusion that Coe was the aggressor and that he was justified in returning Coe's fire. And given that the evidence supported his theory of self-defense, Mingledolph reasons that the evidence could not support his conviction for voluntary manslaughter. We disagree.

Mingledolph's argument fails because it does not acknowledge subsection (b) of the self-defense statute. That subsection, on which the jury was charged, states that a defendant is not entitled to claim self-defense where the evidence shows that the defendant "[i]nitially provoke[d] the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the assailant," or where the

7

defendant "[w]as the aggressor." OCGA § 16-3-21 (b) (1), (b) (3). In this case, the evidence was sufficient to support the State's theory of the case, which was that Mingledolph provoked Coe's use of force against him. That evidence included the fact that Mingledolph participated in the armed robbery of Coe, during which he encouraged Simmons to shoot Coe. Additionally, rather than leaving Lucky Street to avoid an additional confrontation with Coe, as his friends did, Mingledolph armed himself and asked to be left on Lucky Street. And he apparently did so with the hope of encountering Coe, given that he attempted to determine if Coe was hiding in Harmon's Suburban. Finally, when Mingledolph could not ascertain whether Coe was in Harmon's vehicle, he positioned himself as if to wait for Coe. Taken together, these actions support the conclusion that Mingledolph provoked Coe into using force against him, and that he did so intending to return that force. See *Wade v. State*, 305 Ga. App. 819, 821 (701 SE2d 214) (2010) (in determining the sufficiency of the evidence, we consider not only the evidence presented at trial, but also the logical inferences that can be derived from that evidence).

Additionally, this same evidence also supports the conclusion that Mingledolph was the "aggressor" in his confrontation with Coe. OCGA § 16-3-21 (b) (3). Specifically, this evidence shows that Mingledolph pursued Coe and then lay in wait

8

for him. And the conclusion that Mingledolph was the aggressor was further supported by the trial testimony of Harmon's girlfriend, who stated that Mingledolph fired the first shot in the confrontation with Coe. Although contradicted by her previous statement to police, the girlfriend's testimony is nevertheless sufficient to support a finding that Mingledolph was the aggressor. See *Jackson v. State*, 301 Ga. App. 863, 865 (690 SE2d 195) (2010) (where conflicting evidence is presented at trial, it is for the jury, not the appellate court, to resolve the conflict); *Culver v. State*, 290 Ga. App. 321, 322 (659 SE2d 390) (2008) (even where contradicted, the testimony of a single witness is generally sufficient to establish a fact).

In light of the foregoing, we find that the evidence supports the jury's verdict as to voluntary manslaughter.

2. Mingledolph also contends that he received ineffective assistance of counsel based upon his lawyer's failure to call any witnesses or present any evidence in his defense at trial. Alternatively, Mingledolph contends that his lawyer was ineffective because, after discovering that none of the four witnesses in question were present, the lawyer failed to ask for a continuance.

To prevail on his ineffective assistance claim, Mingledolph must prove both that his lawyer's performance was deficient and that he suffered prejudice as a result

of this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LEd2d 674) (1984). If Mingledolph cannot meet his burden of proving either prong of the *Strickland* test, then we need not examine the other prong. *Battles v. State*, 290 Ga. 226, 229 (2) (719 SE2d 423) (2011). Here, we find that Mingledolph has failed to establish that he was prejudiced by this performance.

To demonstrate that he suffered prejudice as a result of his attorney's failure to secure the presence of the four witnesses at issue, Mingledolph was required to prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). To meet this burden, Mingledolph needed to present evidence at the hearing on his motion for a new trial showing both the substance of the missing witnesses' testimony and that such testimony would have been favorable to his defense. *Grell v. State*, 291 Ga. 615, 620 (4) (b) (732 SE2d 741) (2012). Mingledolph, however, failed to present any such evidence. Rather, the only testimony he presented at the motion for new trial hearing was that of his trial lawyer. That attorney testified he recalled that there were potential defense witnesses who, although subpoenaed, did not appear at trial. And although he could not say definitively, trial counsel assumed that those

persons had witnessed, and could therefore testify as to, either the armed robbery of Coe or the shootout between Coe and Mingledolph. The lawyer could not recall, however, what the substance of the witnesses' testimony would have been or if it would have been helpful to the defense.

Given that Mingledolph presented no evidence showing that the missing witnesses would have offered testimony that supported his theory of self defense, he failed to show a reasonable probability that the result of his trial would have been different had trial counsel been successful in securing the testimony of these witnesses. *Boatwright v. State*, 281 Ga. App. 560, 561-562 (2) (636 SE2d 719) (2006) (given his failure to call the missing trial witness at the motion for new trial hearing, or otherwise prove what the witness would have testified to, the defendant did not meet his burden of establishing the prejudice prong of an ineffective assistance claim).

On appeal, Mingledolph attempts to overcome this deficiency in his case by pointing to the pretrial discovery produced by the State. That discovery includes summaries complied by the investigating officers of their interviews with the four witnesses in question. According to these summaries, two of these witnesses told police that Coe fired the first shot in the confrontation with Mingledolph. Thus, Mingledolph contends that these summaries are sufficient to prove that he was

11

prejudiced by counsel's failure to secure the testimony of the four witnesses at issue. This argument, however, is not supported by relevant law.

Our Supreme Court has held that where a defendant's ineffective assistance claim is based on trial counsel's failure to call one or more witnesses to testify on the defendant's behalf, the defendant must either call the witness to testify at the motion for new trial hearing or present some legally acceptable substitute for their testimony to prove the prejudice prong of the *Strickland* test. *Dickens v. State*, 280 Ga. 320, 322 (2) (627 S.E.2d 587) (2006). See also *Reaves v. State*, 292 Ga. 545, 550 (4) (739 SE2d 368) (2013); *Grell*, 291 Ga. at 620 (4) (b). The investigative summaries relied upon by Mingledolph, however, do not constitute a legally acceptable substitute for sworn testimony.[7] This is because such summaries contain hearsay, and "[h]earsay evidence cannot be used . . . under the second *Strickland* prong to establish that the defense was prejudiced by counsel's deficient performance." *Dickens*, 280 Ga. at 322 (2). See also *Grell*, 291 Ga. at 620 (4) (b). Thus, Mingledolph cannot rely on these investigative summaries to establish the prejudice prong of his ineffective assistance claim and, accordingly, that claim must fail.

*Judgment affirmed. Phipps, C. J., and Ellington, P. J., concur.*

---

[7] We emphasize that these are not statements made and signed by the witnesses themselves; rather, they are case notes prepared by the investigating officers, in which the officers summarized the content of their interviews with various witnesses.